**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

GET REAL II, LLC,

Plaintiff,

v.

CITY OF BLACKWELL, OKLAHOMA;
BLACKWELL MUNICIPAL AUTHORITY;
BRYCE S. KENNEDY, individually and in his official capacity;
OKLAHOMA MUNICIPAL LAW, PLLC;
DONALD E. "DESI" STOOPS, individually;
CLARITY TELECOM, LLC d/b/a BLUEPEAK;
JERRY WIELAND, individually;
JERRY EUBANKS, individually;
TRACI HANEBRINK, individually;
TJ GREENFIELD, individually;
RICHARD BRADEN, individually;
JON WEBB, individually;
ROBERT HUSTED, individually;
CHAD SHEPHERD, individually; and
DOES 1 through 50, inclusive,

Defendants.

Case No. CIV-26-[________]

**JURY TRIAL DEMANDED**

**VERIFIED COMPLAINT FOR (1) DECLARATORY JUDGMENT; (2) INJUNCTIVE RELIEF; (3) COMPENSATORY DAMAGES; AND (4) PUNITIVE DAMAGES, AND DEMAND FOR JURY TRIAL**

Plaintiff GET REAL II, LLC, for its Verified Complaint against Defendants, alleges as follows:

## I. THE PARTIES

**The Plaintiff**

1. Plaintiff GET REAL II, LLC ("GET" or "Plaintiff") is an Oklahoma limited liability company with its principal place of business in Oklahoma.

   a. GET is a female-owned limited liability company.

   b. Jessica Pepper is the sole member and authorized representative of GET.

   c. GET is the corporate successor to GET REAL, LLC, ("Original Get Real" or "OGR") which held the franchise from December 30, 2009 to December 29, 2019.

      i. OGR's franchise (from December 30, 2009 to December 29, 2019) with the City was not operated pursuant to an ordinary municipal ordinance.

      ii. OGR's franchise, and the material terms governing the franchise thereof, (from December 30, 2009 to December 29, 2019) operated as the result of an order from the Tenth Circuit, which enforced a settlement between OGR and the City.

      iii. GET succeeded OGR as a corporate entity on or about June 16, 2022, wherein GET came into possession of all of OGR's rights, possessions, and assets, including the franchise with the City.

iv. GET is (presently) the incumbent cable operator in the City of Blackwell (the "City"), Oklahoma, through its corporate succession to OGR.

2. At all times relevant to this suit, GET (and/or its corporate predecessor, OGR) operated as the incumbent provider of cable service in Blackwell under a 2009 franchise ordinance and Pole Attachment Agreement.

**The Defendants**

3. Defendant City of Blackwell, Oklahoma (the "City") is an Oklahoma municipal corporation with authority over, pertinent to this case, public rights-of-way and cable franchising within its limits.

a. At all relevant times, the City was the franchising authority for GET's cable system under the CCPA and acted through its City Council and other final policymakers.

4. Defendant Blackwell Municipal Authority ("BMA") is a public trust and/or municipal authority organized under Oklahoma law.

a. Defendant BMA controls and manages, utility infrastructure and public property in Blackwell, including (and pertinent to this suit), the poles to which GET's facilities are attached;

b. BMA was a party to the pole attachment arrangements at issue, at all times relevant to this suit.

5. Defendant Bryce S. Kennedy ("Kennedy") is, upon information and belief, an Oklahoma resident who, at all relevant times:

a. served as City Attorney for the City, and

b. works as Oklahoma Municipal Law, PLLC, and throughout this Complaint, Kennedy and Oklahoma Municipal Law PLLC are to be treated as one and the same entity; and

c. advised the City and BMA on the matters described in this Complaint.

   i. Claims against Defendant Kennedy are brought against him in his individual capacity, and in his capacity as City Attorney.

6. Defendant Donald E. "Desi" Stoops ("Stoops") is, upon information and belief, an individual who participated in communications and coordination with Kennedy, the City and its officials, and Clarity representatives, concerning Clarity's entry into the Blackwell market.

a. Stoops is sued in an individual capacity.

7. Defendant Clarity Telecom, LLC d/b/a Bluepeak ("Clarity") is a limited liability company organized under the laws of a state other than Oklahoma and authorized to do business in Oklahoma.

a. Clarity provides cable service in Blackwell under a permit issued under Ordinance 2021-15 and a pole attachment agreement with the City.

8. Defendant Jerry Wieland ("Wieland") is, upon information and belief, an Oklahoma resident who at all relevant times served as City Manager for the City.

a. Upon information and belief, Wieland sent the ghostwritten email to Desi Stoops on August 5, 2021, and forwarded Clarity's overbuild threat to the governing body on September 23, 2021.

9. Defendant Jerry Eubanks ("Eubanks") is, upon information and belief, an Oklahoma resident who at all relevant times served as BMA Trust Manager.

a. On November 4, 2021 Eubanks, publicly admitted that the forced teardown of GET's Plant B was retaliatory coercion.

10. Defendant Traci Hanebrink ("Hanebrink") is, upon information and belief, an Oklahoma resident who at all relevant times served as City Clerk and records custodian for the City. Hanebrink was directly responsible for the deficient and incomplete records productions described herein.

11. Defendants TJ Greenfield, Richard Braden, Jon Webb, Robert Husted, and Chad Shepherd are, upon information and belief, Oklahoma residents who at all relevant times served as Mayor and Councilmen for the City.

a. Upon information and belief, the above-cited Defendants in Paragraph 11,

i. Received Bob Scott's October 18, 2021 warning letter of Cable Act violations,

ii. participated in the November 4, 2021 meeting where Eubanks admitted coercion,

iii. enacted and enforced the discriminatory regulatory framework, and

iv. failed to take corrective action upon learning of Kennedy's undisclosed conflicts of interest.

12. Defendants DOES 1 through 50 are individuals or entities whose identities are presently unknown but, who upon information and belief, participated in, facilitated, or contributed to the conduct alleged in this Complaint. They may include additional City

or BMA officials, employees, or agents; consultants or advisors involved in the regulatory process; and representatives of private entities. GET will seek leave to amend to name them when their identities are ascertained.

13. At all times relevant, the City, BMA, and Kennedy acted under color of state law.

14. At all times relevant, Stoops and Clarity acted jointly with those state actors in the conduct alleged in this Complaint.

15. Each Defendant acted individually and in concert with the others under a common plan or course of action, and each is jointly and severally liable for the resulting injuries to GET.

## II. JURISDICTION AND VENUE

16. Subject-Matter Jurisdiction. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521 et seq. (the "CCPA"), and the Supremacy Clause, U.S. Const. art. VI, cl. 2, and under 28 U.S.C. § 1343(a)(3) because GET seeks redress for the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States.

17. Supplemental Jurisdiction. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over GET's claims under the Oklahoma Open Records Act, 51 O.S. §§ 24A.1–24A.30, the Oklahoma Open Meeting Act, 25 O.S. §§ 301–314, 11 O.S. § 22-107.1(B), and Oklahoma common law, including but not limited to breach of contract,

breach of fiduciary duty, conversion, deceptive trade practices, and other Oklahoma statutory and common-law claims that arise from the same nucleus of operative facts.

18. Personal Jurisdiction. This Court has personal jurisdiction over the City and the Blackwell Municipal Authority because they are Oklahoma governmental entities located in this State. It has personal jurisdiction over the individual Defendants and Clarity because each purposefully directed the conduct alleged in this Complaint at Blackwell, Oklahoma, and GET's claims arise from that conduct.

19. Jurisdiction to Grant Declaratory Relief. This Court may grant declaratory relief and further necessary or proper relief under 28 U.S.C. §§ 2201 and 2202, because an actual controversy exists concerning the legality of Defendants' conduct, the validity of Ordinance 2021-15 and the permit framework it created, and the parties' rights and obligations under federal and state law.

20. Venue Is Proper. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in Blackwell, Oklahoma, including the renewal proceedings, the adoption of Ordinances 2021-15 and 2021-18, the amendment of GET's pole agreement, the infrastructure removal demands, and the handling of GET's records requests.

## III. FACTUAL BACKGROUND GIVING RISE TO PLAINTIFF'S CLAIMS

### The 2008 Federal Litigation and the Court-Ordered 2009 Franchise Agreement

21. For more than a decade before the events at issue, GET and its predecessor (OGR) and affiliated entities operated as the incumbent cable provider in Blackwell under a municipal franchise and related infrastructure agreements.

22. In 2008, GET's predecessor (OGR) sued the City in the United States District Court for the Western District of Oklahoma after negotiations over the renewal of its franchise broke down. Get, LLC v. City of Blackwell, No. CIV-08-623-R (W.D. Okla.).

23. At a June 9, 2009 settlement conference, the parties reached a settlement encompassing both a settlement agreement and a comprehensive franchise agreement.

24. When a dispute arose over whether a binding settlement had been reached, the City moved to enforce it, and the district court granted the motion, finding that the parties had agreed on all material terms.

25. The district court's December 23, 2009 enforcement order:

a. fixed the franchise fee at 3.5% of gross revenue (excluding internet services),

b. set a ten-year franchise term, and

c. set a total pole attachment charge of $3.50 per pole under a separate pole attachment agreement.

26. On or about December of 2009, the City enacted Ordinance 2783 granting the franchise and entered into the Pole Attachment Agreement, which together, authorized GET's predecessor (OGR) to construct, maintain, and operate a cable system in the public rights-of-way and on municipal or quasi-municipal infrastructure.

27. On January 13, 2011, the Tenth Circuit affirmed, holding that the district court's finding of a binding settlement was not clearly erroneous and that the court

properly exercised its power to summarily enforce the settlement agreement. Get, LLC v. City of Blackwell, No. 10-6068, 2011 WL 676492 (10th Cir. Jan. 13, 2011).

28. Because its material terms (the franchise fee, term, pole fee, and scope) were fixed by judicial order, the 2009 franchise was not a municipal ordinance that the City could amend or replace at its discretion.

29. The district court's order, as affirmed, is binding on the City under the doctrines of law of the case and res judicata.

30. Among the material terms agreed upon at the June 9, 2009 settlement conference and enforced by the district court, a provision expressly preserving the City's right to lawful exercise of its police powers (eminent domain) was eliminated from the franchise agreement at GET's insistence. The Tenth Circuit affirmed this term in its January 13, 2011 Order and Judgment. The City thereby surrendered its police power of eminent domain as to GET's cable system as part of the court-ordered settlement.

**GET's System and Investments**

31. In reliance on the court-ordered franchise, GET made substantial, long-term investments, including installing and maintaining cable and fiber infrastructure; deploying network facilities across public rights-of-way; integrating equipment into pole systems; providing service to residential and commercial subscribers; and developing operational systems tied to its Blackwell footprint. These were sunk, location-specific investments, made in reliance on a stable regulatory environment and on the expectation that any renewal would be governed by federal law.

32. Over the course of its operations, GET executed approximately 500 pole transfers and maintained continuous service.

33. For more than fifteen years, GET operated two separately maintained, separately insured, and separately regulated cable plants, "Plant A" and "Plant B." Plant B was GET's planned fiber migration path and comprised approximately 15 miles of fiber on the second attachment.

34. GET complied with its franchise obligations, paid the applicable fees, participated in the City's regulatory processes, and coordinated with the City and BMA on infrastructure and service delivery.

35. The City and BMA recognized GET as the incumbent operator.

36. In more than two decades of operation, GET's system never received a capacity-related notice or violation.

**GET Invokes the § 546 Renewal Process**

37. As the court-enforced franchise term neared its end, GET invoked the renewal procedures of 47 U.S.C. § 546 through written communications to the City on or about May 2, 2017, that expressly referenced federal law and requested that the renewal be conducted in accordance with the CCPA.

38. GET was not a new entrant seeking discretionary approval; GET was the incumbent operator, serving customers and maintaining infrastructure under existing franchise authority.

39. The City did not reject GET's invocation of § 546.

40. The City initially engaged in that process by scheduling and conducting public hearings on GET's renewal; requesting documentation concerning GET's operations, performance, and compliance; reviewing the technical and operational materials GET submitted; and engaging in evaluative discussions consistent with the statutory framework.

41. Throughout the renewal process, GET acted in good faith, complied with its existing obligations and with each procedural requirement the City imposed, and never disengaged from the process, abandoned its rights, or agreed to any departure from the federal renewal framework.

**Clarity's Permit Application while the GET Renewal is Pending**

42. The City subsequently began to disengage in the process, and delayed GET's renewal application process for almost two years.

43. While the City delayed GET's renewal application, the City advanced a separate, permit-based framework for a competing provider, Clarity Telecom, LLC d/b/a Bluepeak ("Clarity").

**The Delay of the Renewal Process and Kennedy's Statements About the Delay and Franchise**

44. The City did not complete the renewal. GET's renewal remained pending for almost two years after the process began.

45. At the September 2, 2021 City Council meeting, Kennedy acknowledged the delay, told GET that "you do deserve an apology," and said GET's renewal was "top of the list" of matters needing immediate attention.

46. Kennedy described GET's existing franchise as the "80-page" agreement he "didn't write."

47. As City Attorney, Kennedy had inherited responsibility for administering that franchise.

48. Kennedy also publicly asserted that GET had failed to provide information necessary to proceed with the renewal, even though the City had previously acknowledged receiving and reviewing that information. That alleged justification for the delay was false; and Kennedy knew it was false.

49. Kennedy told the City Council that the City had raised GET's franchise fee "from 3% to 5%." The fee fixed by the court-enforced franchise was 3.5%, not 3%.

50. In communications with Gregory Pepper, Kennedy referred to the 2009 federal case and said he was "not afraid of federal court."

51. On August 3, 2021, Kennedy sent an email to City Manager Jerry Wieland and City Clerk Traci Hanebrink containing a pre-drafted letter to DONALD E. "DESI" STOOPS for Wieland to send. The letter stated: "The City of Blackwell is interested in speaking with you and your corporate leaders about the possibility of Clarity doing fiber to the home network in Blackwell."

52. Wieland sent that email verbatim on August 5, 2021.

53. On August 17, 2021, Stoops wrote to Kennedy: "Making sure you got the signed document for your help" — referring to what appears to be the signed Legal Consulting Agreement for Kennedy to represent Clarity through an agreement with Holland and Hart.

54. GET did not discover this ghostwriting until November 12, 2025.

**Kennedy's Apparent Consulting Relationship with Clarity**

55. Upon information and belief, during the same period in which he advised the City on GET's renewal and Clarity's permit, Kennedy had a consulting relationship with entities associated with Clarity, under which he was compensated at $250 per hour, a rate substantially exceeding his compensation as City Attorney.

56. Upon information and belief, Kennedy did not fully disclose the existence or nature of this relationship to the City's decision-makers while matters affecting GET and Clarity were before them.

57. Kennedy's consulting relationship was not discovered until November 12, 2025, when the City finally produced drafts, redlines, and communications revealing the ghostwriting and private Kennedy-Clarity communications.

58. The Legal Consulting Agreement itself was not produced until December 31, 2025, as part of a 950+ page production made after the City had represented its November 12, 2025 production as complete.

59. The communications produced on November 12, 2025 also revealed that the price Kennedy and Stoops were pressuring GET to accept for sale of the cable system was completely out of line with fair market value.

60. The timing of the consulting relationship coincides with a series of regulatory actions, described below, that consistently operated to GET's detriment and to Clarity's benefit.

**Clarity's Permit Advances in Parallel**

61. In August of 2021, while GET's renewal remained pending, Stoops told Clarity representatives that materials could be "disperse[d] to the council and mayor as talking points."

62. City Manager Wieland responded, "Much appreciated!"

63. On September 2, 2021, at the same meeting at which Kennedy apologized for the delay in GET's renewal, the City Council held a public hearing on Clarity's application for a cable operator permit and approved the first reading of Ordinance 2021-15.

64. Councilmember Webb moved for approval and Councilmember Husted seconded.

65. The vote was unanimous, with Councilmembers Greenfield, Husted, and Webb voting aye.

66. The first reading of Ordinance 2021-15 came more than two months before the City acted on GET's renewal application.

67. The competing permit framework was not a response to GET's renewal. It was developed in parallel while GET's renewal remained unresolved.

68. At the September 16, 2021 Council meeting, Kennedy stated that GET's renewal required two documents, (1) an ordinance re-adopting the 2009 franchise with amendments and (2) an amended pole agreement, and that "the parties had agreed on the ordinance" but still had issues with the pole agreement.

69. On September 23, 2021, City Manager Wieland wrote, regarding communications from Clarity's side, "I have passed this on to the governing body as well!" Those communications reached the Council outside any public meeting.

70. On September 14, 2021, Stoops texted Greg Pepper that Stoops had told Kennedy to delay Clarity's franchise pursuit for 30 days while a purchase deal was explored. Kennedy concealed this 30-day pause from the Council and nonetheless kept the Clarity items on the September 16, 2021 agenda.

**The City, through Its Attorney Kennedy, Sought to Economically Coerce GET by Imposing Unfair and Unwarranted "Removal" Terms**

71. On November 3–4, 2021, Kennedy sent written proposed "removal terms" that referred to the prior federal litigation and proposed removal of GET's additional connections; delivery of the removed equipment to GET's office; and charging GET the cost of removal.

72. Kennedy's November 4, 2021 correspondence tied his recommendation that the Council approve the renewal to GET's agreement to a pole agreement.

73. On November 18, 2021, the City Council granted GET's renewal by adopting Ordinance 2021-18.

74. The City did not issue the findings, determinations, or notice required by § 546.

75. Ordinance 2021-18 increased GET's franchise fee from the court-enforced 3.5% to 5%.

76. The City did not seek or obtain judicial authorization to modify the court-enforced terms.

77. On the same date, the City approved the First Amendment and Extension to the Pole Agreement.

78. On October 18, 2021, attorney Bob Scott (Davis Wright Tremaine LLP) sent a letter directly to Mayor TJ Greenfield and Councilmen Braden, Webb, Husted, and Shepherd warning that the City was violating the Cable Act, that the City Attorney was pressuring GET to sell to Clarity, and that the City's conduct was "in irreconcilable conflict" with federal law.

79. The Council members were on notice.

80. On November 3, 2021, Kennedy sent proposed terms stating: "Not more than one connection per pole… If more than one connection, Get Real must remove… will be removed by City and delivered to office of Get Real, and Get Real will be charged and pay actual cost of removal." This demanded physical removal from approximately 2,098 poles.

81. On November 4, 2021, BMA Trust Manager Jerry Eubanks publicly admitted that the forced teardown was retaliatory, stating: "he got stubborn and took that out of the deal. So we wanted to take something back. We want one of our connections. If you're not going to guarantee us fibers of the home, we're not going to guarantee you can have two."

82. Jessica Pepper objected on November 16, 2021: "the BMA will remove our second attachment arbitrarily. This could put customers' services in jeopardy if the

second attachment is in use." Bob Scott struck the removal language from the draft pole agreement.

**Final Adoption of Clarity's Permit**

83. The City approved Clarity's permit on first reading on September 2, 2021.

84. During the pending permit application for Clarity, materials from Clarity were passed to the City Council outside any public meeting.

85. On December 1, 2021, while Ordinance 2021-15 was pending before the Council, Kennedy wrote, in a private communication about the ordinance's terms, "ARE YOU STUCK ON THREE? I THOUGHT YOU HAD AGREED." The message was a negotiation over the consideration and obligations in the ordinance, conducted outside any public meeting.

86. On December 16, 2021, the City Council adopted Ordinance 2021-15 on final reading, establishing a non-exclusive cable operator permit for Clarity.

87. The permit authorizes Clarity to provide cable service in the same area GET serves, over the same poles and rights-of-way.

88. The obligations imposed on the two operators differ materially. Under its franchise, GET is subject to franchise fees of 5% of gross revenue; PEG channel contributions; continuous reporting requirements; mandatory audits; 24/7 operational standards; Emergency Alert System compliance; infrastructure obligations; and substantial insurance and indemnification requirements.

89. Clarity was permitted to enter and operate in the same market without comparable obligations.

90. The consumer protection disparity is particularly stark.

91. On March 4, 2008, the City adopted Resolution 03-03-08B, enacting the FCC Cable Television Consumer Protection and Customer Service Standards. Section 14-111 of Ordinance 2783 — GET's franchise — expressly incorporated those standards as a condition of the franchise, providing that the franchisee "shall meet or exceed the customer service standards as adopted by a resolution of the Blackwell City Council" and that those standards "shall be considered a part of the terms and conditions of this Franchise ordinance." These standards have never been repealed and remain in full force and effect. Under these standards, GET has been required for over twelve years to maintain a local business office conveniently located within the community and open during normal business hours; maintain a toll-free or collect-call telephone line available 24 hours a day, 7 days a week; answer customer calls — including wait time — within 30 seconds at least 90% of the time, measured quarterly; complete standard installations within seven days; begin correcting service interruptions within 24 hours; schedule service appointments in defined time blocks; comply with detailed billing and notice requirements; provide subscribers with specified information at installation, annually, and upon request; and file quarterly customer service performance reports with the City signed and certified by an officer of the franchisee.

92. GET has complied with all of these requirements throughout the life of its franchise.

93. Clarity's permit under Ordinance 2021-15 contains none of these consumer protection requirements. There is no local office requirement. No telephone answering

standards. No installation timelines. No service interruption response requirements. No quarterly customer service reporting. No billing notice requirements. No subscriber information requirements.

94. The City imposed these consumer protection obligations on GET for over twelve years while allowing Clarity to operate in the same market with none of them — a disparity that directly harms both GET and the subscribers it serves.

95. Had the City properly acted on GET's franchise renewal, Clarity would have been required to follow the same terms and conditions GET followed over the past twelve years, including the consumer protection laws that provide for a local office, telephone availability standards, installation and service timelines, quarterly reporting, and all other customer service obligations. The City's failure to properly complete GET's renewal — and its decision instead to create a parallel permit framework without these obligations — allowed Clarity to compete in the same market while bearing none of the consumer protection costs that GET has borne for over a decade.

96. The City violated 11 O.S. § 22-107.1(B) by granting Clarity a permit on terms more favorable and less burdensome than those in GET's existing court-enforced franchise. The violation occurred when the City granted Clarity the more favorable permit in the first place — exactly what the statute prohibits — not merely in failing to extend those terms to GET. (GET had already initiated renewal proceedings years earlier, completed the public hearing process, and refused to accept Clarity's permit terms as a substitute for its franchise because those terms stripped GET of protections it had fought for in federal court.)

**The Plant B Removal Demands and the Pretextual Capacity Rationale**

97. The City's authority to demand removal of GET's infrastructure was eliminated by the 2009 court-ordered settlement, in which the City surrendered its police power of eminent domain.

98. The City had no lawful authority to threaten or attempt physical removal of GET's cable infrastructure — the very police power it had surrendered was the power it now purported to exercise.

99. Defendants pressed GET to remove Plant B while GET still needed its strand route for fiber migration.

100. The demand forced GET to restructure, de-lash, and re-lash its facilities and to accelerate construction, at substantial cost.

101. Kennedy threatened that GET's facilities would be "taken down and thrown at GET's front door."

102. Defendants justified the removal demand by asserting a lack of pole capacity.

103. That justification was pretextual.

104. GET's system had operated for more than two decades without a capacity-related violation or notice.

105. Clarity itself performed a comprehensive engineering analysis of the same poles and submitted its findings to the City.

106. Despite having that data, Defendants never issued GET a make-ready notice requiring it to adjust its facilities, which they would have done had a real capacity constraint existed.

107. No comparable removal requirement was imposed on Clarity.

108. Clarity's contractors caused physical damage to GET's infrastructure, including stealing approximately 600 six-inch-helix screw-anchor assemblies belonging to GET, wrapping GET's lines at 21st and Lincoln, and screwing in anchors without utility locates.

109. GET reported these thefts and property-damage incidents to the Blackwell Police Department and sought to file theft and property-damage complaints against Clarity's contractors.

110. The police refused to pursue charges, stating that they had received instructions from above.

111. The City also refused to produce police records and incident reports related to the theft and damage in response to GET's open records requests, denying GET the evidentiary basis necessary to pursue its property claims. These police records were not produced until August 27, 2026 — nearly five years after the first request.

112. Without access to the police records and with the police refusing to pursue charges, GET was forced to file a civil action against Clarity (Get Real II, LLC v. Clarity Telecom, LLC, CJ-2024-250) for conversion of its anchors and damage to its plant.

113. Unable to fully substantiate its claims due to the City's refusal to produce police records, GET was forced to settle the case for a nominal sum of $3,000 — a

fraction of the actual value of the approximately 600 stolen anchors (conservatively valued at $100 each, or $60,000 total) plus the damaged plant.

114. Despite the settlement and the documented property damage, the City took no internal action to correct the underlying problem or enforce equal treatment between GET and Clarity.

**Economic Coercion and Pressure to Sell to Clarity**

115. Defendants used their regulatory authority to pressure GET to sell its company to Clarity.

116. Kennedy threatened an overbuild by Clarity; Defendants imposed bonding requirements that GET could not afford; Kennedy demanded that GET agree to a shortened permit and insisted that Pepper answer “yes” to his terms; and Kennedy threatened removal of one of GET’s operating cable plants.

117. At the same time, Defendants promoted Clarity as the preferred buyer of GET’s business, linking regulatory action to a private economic outcome.

118. In 2022, GET accepted terms from the City while these threats of infrastructure removal, service shutdown, and regulatory retaliation remained in effect.

119. GET consistently objected to the arrangement, and the threats continued after its acceptance.

120. In early 2022, Greg Pepper was hospitalized with stage 5 renal failure. The timing of the coercive demands — ongoing threats of infrastructure removal, bonding requirements, and regulatory retaliation — coincided with this period of medical vulnerability.

121. Under 11 O.S. § 22-107.1(B), the existing cable franchise or permit holder is entitled, upon written notice to the municipality, to adopt the more favorable or less burdensome terms of any overlapping permit granted to a competing provider, and the adopted terms "shall become enforceable by the municipality." The City granted Clarity's permit under Ordinance 2021-15 on December 16, 2021, imposing materially lighter obligations than those under GET's franchise. GET invoked its statutory parity right by written notice to the City, seeking to adopt Clarity's more favorable permit terms. The City delayed for over six months before passing Ordinance 2022-11 on June 16, 2022, which purported to grant GET the right to adopt Clarity's permit terms. However, the City's delay in enforcing the statutory parity right caused GET to operate under materially more burdensome terms than Clarity from December 16, 2021 through June 16, 2022 — a period of six months during which GET was denied its statutory right to equal treatment. Even after June 16, 2022, the City failed to actually enforce the parity terms, leaving GET subject to the more burdensome franchise obligations while Clarity operated under the lighter permit framework.

**GET's Records Requests and the City's Deficient Productions**

122. GET believed they were not being treated fairly, and that part of that unfairness was being promulgated through the City Council.

123. GET sought records on Freedom of Information ("FOIA") requests.

124. GET submitted multiple requests under the Oklahoma Open Records Act for records concerning the renewal, Ordinance 2021-15, and communications between City officials and Clarity, and sent written requests that the City preserve those records.

125. GET also asked the City in writing to assure equal treatment and to audit and enforce parity.

126. Kennedy responded on the City's behalf.

127. The City's responses were incomplete, delayed, and structurally deficient.

128. Among other things, the City produced at least fifty-six (56) email entries consisting only of header information, with no body content or attachments; produced no communications from key decision-makers that would reasonably be expected to exist; delayed production of requested records, in some instances for years; claimed it could not locate records and asserted exemptions without adequate justification; produced records in a format that made meaningful review impossible; reported that no meeting videos were available; and did not produce financial and operational records relevant to regulatory parity.

129. GET did not learn of Kennedy's consulting relationship or the private communications with the Council until the City's 2025–2026 productions.

130. GET submitted its first Open Records request on September 2, 2021. Despite repeated requests over the following years, the City did not produce meaningful records until November 12, 2025 — a delay of 4 years, 2 months, and 10 days — and even then represented that production as complete. Seven weeks later, on December 31, 2025, the City produced 950+ additional pages including Kennedy's Legal Consulting Agreement, which had been withheld for over four years. As of August 27, 2026 — nearly 5 years after GET's first request — the City had still not produced meeting videos, 56 email entries with only headers and no body content, deletion logs, Kennedy's billing

records, or conflict waiver records. This pattern of delay, incomplete production, and concealment demonstrates bad faith.

131. In August 2026, the City gave GET a false explanation for the deficiencies in its production.

132. These deficiencies support an inference that relevant information was withheld, altered, or not preserved, which reinforces GET's allegations of bad faith and improper motive.

133. Defendants' duty to preserve that information arose when litigation was reasonably anticipated.

134. On August 10, 2026, GET referred these matters to the Oklahoma Attorney General and the Kay County District Attorney for investigation.

**GET's Damages**

135. As a direct result of Defendants' conduct, GET has suffered substantial and continuing economic harm, including millions of dollars in compliance costs over the life of its franchise, borne while its competitor operated without comparable obligations; loss of market position and diminished business value; impairment of its sunk, location-specific infrastructure investments; the costs of removing Plant B and accelerating its fiber migration; and long-term harm to its economic viability and competitive standing, including specifically:

(a) franchise fee overpayment (the difference between 3.5% court-ordered and 5% imposed);

(b) PEG capital contributions required of GET but not Clarity;

(c) insurance and bonding costs imposed on GET but not Clarity;

(d) Plant B removal and accelerated fiber migration costs;

(e) physical damage repair costs (stolen anchors, wrapped lines, anchors without locates);

(f) loss of subscribers to Clarity;

(g) loss of business value; and

(h) legal fees incurred in the 2008 federal litigation and subsequent enforcement.

136. Based on the evidence now available GET's damages are reasonably estimated to exceed $3,000,000. The harm is ongoing and will continue absent judicial relief.

## IV. STATUTORY AND REGULATORY FRAMEWORK

### A. Federal Law

137. The CCPA establishes a national policy concerning cable communications and balances the interests of cable operators, franchising authorities, and the public. 47 U.S.C. § 521.

138. The CCPA provides that a franchising authority may not grant an exclusive franchise, 47 U.S.C. § 541(a); may not impose any requirement that has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of a telecommunications service by a cable operator, id. § 541(b)(3)(B); may not collect franchise fees exceeding 5% of a cable operator's gross revenues, id. § 542; may not impose requirements regarding the provision or content of cable services except as

expressly provided in Title VI, id. § 544(a); and may regulate services, facilities, and equipment only "to the extent consistent with this subchapter," id. § 544(b).

139. Section 546 governs the renewal of cable franchises. Once the renewal process is triggered, the franchising authority must conduct a public proceeding; the incumbent operator is entitled to participate and present evidence; the franchising authority must evaluate the operator's performance under the statutory criteria; and the franchising authority must render a decision granting or denying renewal. 47 U.S.C. § 546.

**B. Oklahoma Law**

140. Oklahoma law provides that no municipality shall grant any overlapping certificate, license, permit, or franchise on terms more favorable or less burdensome than those in any existing certificate, license, permit, or franchise, and that the existing holder is entitled to adopt the more favorable or less burdensome terms. 11 O.S. § 22-107.1(B).

141. The Oklahoma Open Meeting Act requires that meetings of public bodies be held in public after proper notice, 25 O.S. §§ 301–314, and provides that action taken in willful violation of the Act is invalid, id. § 313.

142. The Oklahoma Open Records Act requires that public records be made available for inspection and copying. 51 O.S. §§ 24A.1–24A.30.

143. The Oklahoma Governmental Tort Claims Act, 51 O.S. § 151 et seq., does not apply to claims that a municipality violated the federal Constitution. In addition, if the City purchased liability insurance, its governmental immunity from tort liability is waived to the extent of the coverage purchased.

144. The CCPA expressly preempts inconsistent state and local law: "Except as provided in section 557 of this title, any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superceded." 47 U.S.C. § 556(c).

145. The Blackwell City Charter, Article III, Section 2, requires that no ordinance (unless an emergency measure) "shall be passed until it has been read at two regular meetings not less than one week apart." Article III, Section 3 defines emergency as relating to "the preservation of the public peace, property, health or safety." The preamble of Ordinance 2021-15 does not satisfy this definition.

## V. CLAIMS FOR RELIEF

### COUNT I
### Deprivation of Property Without Due Process of Law
### (42 U.S.C. § 1983; U.S. Const. amend. XIV)
### Against All Defendants

146. GET incorporates ¶¶ 1–145.

147. The Fourteenth Amendment prohibits a State from depriving any person of property without due process of law. That guarantee is enforceable against state actors, and private parties acting jointly with them, under 42 U.S.C. § 1983.

148. GET had constitutionally protected property interests in its franchise and its rights under 47 U.S.C. § 546 (¶¶ 37–41); the court-enforced settlement and franchise affirmed in Get, LLC v. City of Blackwell, No. 10-6068 (10th Cir. 2011) (¶¶ 22–30); its sunk, location-specific infrastructure investments (¶¶ 31–33); and the legitimate

expectation that the renewal process would be completed in accordance with federal law (¶ 41).

149. Defendants deprived GET of those interests by delaying the renewal for almost two years (¶¶ 42–44); granting the renewal without the procedures § 546 requires (¶¶ 73–74); modifying the court-enforced fee from 3.5% to 5% without judicial authorization (¶¶ 75–76); creating, in parallel, a permit framework with materially lighter obligations for Clarity (¶¶ 63–67, 86–89); failing to apply 11 O.S. § 22-107.1(B) (¶¶ 96, 121); and imposing infrastructure removal requirements that impaired GET's operations without a meritorious reason (¶¶ 97–107).

150. These deprivations occurred without notice, a meaningful hearing, or the findings required by federal law, and they rested on justifications Defendants knew to be false.

151. Defendants' conduct was arbitrary and was a substantive, not merely procedural, deprivation: the City initiated a federally governed process, induced GET's participation, and then replaced that process with an alternative scheme that denied GET the protections federal law provides.

152. Kennedy is not entitled to qualified immunity.

153. A municipal official who knowingly circumvents a federal court order and modifies court-enforced terms acts outside the scope of legitimate governmental authority.

154. Ordinances 2021-15 and 2021-18 are formally enacted legislative acts of the City's final policymakers and constitute official municipal policy that was the moving force behind the deprivation.

155. The City's continued conduct after receiving Bob Scott's October 18, 2021 warning letter demonstrates deliberate indifference.

156. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT II**
**Denial of Equal Protection, Class of One**
**(42 U.S.C. § 1983; U.S. Const. amend. XIV)**
**Against All Defendants**

157. GET incorporates ¶¶ 1–156.

158. The Equal Protection Clause prohibits government from intentionally treating a person differently from others similarly situated without a rational basis. GET and Clarity are similarly situated — both are cable operators authorized under Title VI, use the same poles and rights-of-way, and serve the same market.

159. Defendants intentionally treated GET differently from Clarity: GET must pay a 5% franchise fee and Clarity pays no comparable fee; GET is subject to PEG, insurance, reporting, audit, and infrastructure obligations and Clarity is not; GET was required to remove infrastructure and Clarity was not; and GET's renewal was delayed for almost two years while Clarity's permit was advanced on an expedited timeline.

160. The differential treatment has no rational basis. Kennedy's undisclosed consulting relationship with Clarity (¶¶ 53, 55–58) is direct evidence of favoritism, not merely an inference.

161. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT III**
**Violation of the CCPA and Preemption Under the Supremacy Clause**
**(47 U.S.C. §§ 541(b)(3), 544(b), 546, 556(c); U.S. Const. art. VI, cl. 2)**
**Against the City, BMA, and Kennedy in his official capacity**

162. GET incorporates ¶¶ 1–161.

163. Defendants violated 47 U.S.C. § 546 by initiating the renewal process, delaying it for almost two years, and then granting the renewal on November 18, 2021 without the findings, determinations, or notice the statute requires.

164. Defendants violated 47 U.S.C. § 541(b)(3)(B) by using cable-franchise authority to condition and restrict GET's provision of telecommunications services while permitting Clarity to operate under materially lighter obligations.

165. Because Clarity sought and obtained authorization to provide cable service, its permit is governed by Title VI, not by state law.

166. Ordinance 2021-15, as applied with GET's franchise, is preempted under express preemption (§ 556(c)), conflict preemption (§§ 541(b)(3)(B), 544(b)), and obstacle preemption.

167. A municipality that enacts and enforces a preempted ordinance is liable under 42 U.S.C. § 1983.

168. GET is entitled to a declaration that Ordinance 2021-15 and the permit framework are preempted, to an injunction against their enforcement, and to damages in excess of $75,000.00.

**COUNT IV**
**Civil Conspiracy**
**(42 U.S.C. § 1983 and Oklahoma Common Law)**
**Against All Defendants**

169. GET incorporates ¶¶ 1–168.

170. Defendants, acting under color of state law and jointly with private parties, agreed to pursue unlawful objectives, including circumventing the § 546 renewal process; circumventing the federal court order enforcing the 2009 franchise; creating a Title VI permit framework with materially lighter obligations for Clarity; violating the Oklahoma Open Meeting Act through serial communications; using economic coercion to force a sale of GET's business; and subjecting GET to terms materially less favorable than Clarity's.

171. Defendants committed overt acts in furtherance of the conspiracy, including delaying the renewal; circulating Clarity's "talking points" to the Council; approving the first reading of Ordinance 2021-15; granting the renewal without § 546 process; finalizing Clarity's permit; imposing infrastructure removal requirements; Kennedy's ghostwriting of the email to Stoops (¶ 51); Kennedy's concealment of Stoops's 30-day pause (¶ 70); Eubanks's public admission of coercion (¶ 81); the Mayor and Council's receipt of Bob Scott's warning letter without corrective action (¶ 78); physical damage to

GET's infrastructure by Clarity's contractors (¶ 108); and producing incomplete and deficient records.

172. The conspiracy also included withholding and concealing records relevant to Kennedy's conflict of interest. The conspiracy was not discovered until November 12, 2025, when the City finally produced communications revealing the ghostwriting and out-of-line sale price. The City then produced 950+ additional pages on December 31, 2025 after representing its November 12 production as complete.

173. Officials who instigate, direct, or actively participate in an illegal conspiracy to circumvent competition on the merits act outside the sphere of legitimate legislative activity and are not immune.

174. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT V**
**Tortious Interference with Business Relations and Expectancy**
**(Oklahoma Common Law)**
**Against Kennedy in his individual capacity**

175. GET incorporates ¶¶ 1–174.

176. GET had existing and prospective business relationships with its subscribers and in the Blackwell market, grounded in its court-enforced franchise, its infrastructure, and its incumbent status.

177. Kennedy knew of those relationships and intentionally and maliciously interfered with them, without justification, by delaying the renewal; granting the renewal without § 546 process and on modified terms; advancing Clarity's competing permit;

failing to enforce parity; imposing infrastructure removal requirements; using regulatory pressure to influence sale negotiations; ghostwriting the email to Stoops (¶ 51); and concealing Stoops's 30-day pause (¶ 70).

178. Kennedy acted in bad faith and with malice, as shown by his undisclosed consulting relationship with Clarity, his misstatement of the court-enforced fee, his statement that he was "not afraid of federal court," and his threats against GET's infrastructure.

179. As a direct and proximate result, GET has lost business expectancies and suffered damages in excess of $75,000.00.

**COUNT VI**
**Violation of the Oklahoma Open Records Act**
**(51 O.S. §§ 24A.1–24A.30)**
**Against the City and BMA**

180. GET incorporates ¶¶ 1–179.

181. The City and BMA are public bodies subject to the Open Records Act, which requires them to make public records available for inspection and copying.

182. The City and BMA violated the Act by failing to provide complete, timely, and usable responses to GET's requests, as described above.

183. As a direct and proximate result, GET has been deprived of information necessary to vindicate its rights and has been injured in excess of $75,000.00.

**COUNT VII**
**Violation of the Oklahoma Open Meeting Act**
**(25 O.S. §§ 301–314)**
**Against the City, Kennedy, and Stoops**

184. GET incorporates ¶¶ 1–183.

185. The Open Meeting Act prohibits a public body from deliberating or deciding outside a properly noticed public meeting, including through serial communications relayed by an intermediary to a majority of the body (a "walking quorum").

186. Defendants violated the Act through the August 2021 "talking points" exchange; the City Manager's September 23, 2021 transmission of private communications to the "governing body"; Kennedy's December 1, 2021 private negotiation of ordinance terms; and Kennedy's September 16, 2021 concealment of Stoops's 30-day pause from the Council (¶ 70).

187. The violations were willful.

188. Under 25 O.S. § 313, Ordinance 2021-15 and the permit framework it created are invalid.

189. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT VIII**
**Economic Coercion and Abuse of Regulatory Authority**
**(42 U.S.C. § 1983)**
**Against All Defendants**

190. GET incorporates ¶¶ 1–189.

191. Defendants used regulatory authority to coerce GET into accepting unfavorable terms and to influence the sale of its business. Those demands had no legitimate regulatory justification, as shown by the absence of any make-ready notice and Clarity's own engineering analysis showing capacity was not an issue.

192. The coercion included: Kennedy's threat that facilities would be "taken down and thrown at GET's front door"; Kennedy's November 3, 2021 forced teardown demand; Eubanks's November 4, 2021 admission that the teardown was retaliatory; Stoops's September 23, 2021 statement that "We may just end up building it all ourselves and let the chips fall where they may"; and Wieland's September 23, 2021 forwarding of the overbuild threat to the governing body. Each of these threats was made in exercise of police powers the City had surrendered in the 2009 court-ordered settlement.

193. Economic duress renders consent voidable. The duress was continuing, and GET's 2022 acceptance does not bar relief.

194. Greg Pepper's hospitalization for stage 5 renal failure in early 2022 exacerbated the duress.

195. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT IX**
**Breach of Contract — Franchise Agreement**
**Against the City**

196. GET incorporates ¶¶ 1–195.

197. The court-enforced franchise was a binding contract between GET (and its predecessor OGR) and the City, whose material terms were fixed by judicial order.

198. The City breached the franchise by increasing the fee from 3.5% to 5% without judicial authorization, failing to complete the § 546 renewal process, and imposing requirements not in the original agreement.

199. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT X**
**Breach of Contract — Pole Attachment Agreement**
**Against BMA**

200. GET incorporates ¶¶ 1–199.

201. The court-enforced Pole Attachment Agreement fixed the pole fee at $3.50 per pole and authorized GET's two attachments.

202. BMA breached the agreement by demanding removal of one attachment and threatening physical removal.

203. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT XI**
**Breach of Court-Ordered Settlement**
**Against the City**

204. GET incorporates ¶¶ 1–203.

205. The December 23, 2009 enforcement order fixed material terms, including the elimination of the City's police power of eminent domain.

206. The City's modification of those terms without returning to federal court, and its threats to physically remove GET's infrastructure using police powers it had surrendered, constitute a breach of the court-ordered settlement.

207. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT XII**
**Breach of Good Faith and Fair Dealing**
**Against the City and BMA**

208. GET incorporates ¶¶ 1–207.

209. Oklahoma law implies a covenant of good faith and fair dealing in every contract.

210. The City and BMA acted in bad faith by using the renewal process as leverage to coerce a sale, by creating a competing framework in parallel, and by concealing Kennedy's conflict of interest.

211. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT XIII**
**Breach of Statutory Parity Right**
**Against the City**

212. GET incorporates ¶¶ 1–211.

213. 11 O.S. § 22-107.1(B) required the City to offer GET the more favorable terms of Clarity's permit upon GET's written notice. The City delayed enforcement of this statutory right for over six months, from December 16, 2021 to June 16, 2022, and failed to actually enforce parity even after that date (¶ 121).

214. The City's six-month delay in enforcing GET's statutory parity right and its failure to actually enforce parity even after June 16, 2022 violated 11 O.S. § 22-107.1(B).

215. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT XIV**
**Breach of Fiduciary Duty**
**Against Kennedy, Wieland, Eubanks, Mayor, and Council**

216. GET incorporates ¶¶ 1–215.

217. Kennedy owed fiduciary duties to the City as its attorney. Elected officials owed fiduciary duties to the public.

218. Kennedy's undisclosed consulting relationship with Clarity, and the officials' knowing receipt of Bob Scott's warning letter (¶ 78) without corrective action, constitute breaches of fiduciary duty.

219. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT XV**
**Conversion / Trespass to Chattels**
**Against Clarity**

220. GET incorporates ¶¶ 1–219.

221. Clarity's contractors stole GET's anchors, wrapped GET's lines, and installed anchors without locates, causing physical damage to GET's property (¶ 108).

222. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT XVI**
**Oklahoma Deceptive Trade Practices Act**
**(78 O.S. § 51 et seq.)**
**Against Clarity**

223. GET incorporates ¶¶ 1–222.

224. Clarity's entry into the market under a framework obtained through Kennedy's undisclosed consulting relationship and false representations to the Council constitutes a deceptive trade practice.

225. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT XVII**
**Ultra Vires Municipal Action — Declaration of Voidness**
**Against the City**

226. GET incorporates ¶¶ 1–225.

227. Under Oklahoma law, municipal actions that exceed the authority granted by state law are void. The City lacked authority to modify a court-enforced franchise without judicial authorization and to create a competing framework that violates the CCPA. The City's threats to physically remove GET's infrastructure were also ultra vires because the City had surrendered its police power of eminent domain in the 2009 settlement (¶ 30).

228. GET is entitled to a declaration that Ordinance 2021-15 is void ab initio.

**COUNT XVIII**
**Intentional Interference with Performance of Contract**
**Against Kennedy, Stoops, and Clarity**

229. GET incorporates ¶¶ 1–228.

230. Under Restatement (Second) of Torts § 766A, a party who intentionally causes another to breach or make performance more burdensome is liable. Kennedy's consulting relationship and regulatory actions made GET's performance of its franchise more costly and burdensome.

231. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT XIX**
**Breach of Oath of Office**
**Against Mayor and Council**

232. GET incorporates ¶¶ 1–231.

233. Under Okla. Const. Art. XV, § 1, elected officials swear to support the Constitutions and laws of the United States and Oklahoma.

234. The Mayor and Council enacted and enforced ordinances that violate federal law (CCPA) and state law (Open Meeting Act, parity statute), in breach of their oaths.

235. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT XX**
**Damaging of Private Property Without Just Compensation**
**(Okla. Const. Art. II, § 23)**
**Against All Defendants**

236. GET incorporates ¶¶ 1–235.

237. Under Okla. Const. Art. II, § 23, private property shall not be damaged for public use without just compensation.

238. Defendants' actions damaged GET's infrastructure and business value without compensation.

239. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**COUNT XXI**
**Fifth Amendment Takings**
**(U.S. Const. amend. V; 42 U.S.C. § 1983)**
**Against the City and BMA**

240. GET incorporates ¶¶ 1–239.

241. The City's actions — including the infrastructure removal demands, the discriminatory regulatory framework, and the use of regulatory authority to depress GET's business value — may work a taking of GET's private property without compensation. Bob Scott's October 18, 2021 letter specifically raised this possibility.

242. The takings claim is strengthened by the fact that the City surrendered its police power of eminent domain in the 2009 court-ordered settlement (¶ 30). The City cannot take or damage private property for public use when it has already given up the power to do so.

243. As a direct and proximate result, GET has suffered damages in excess of $75,000.00.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff GET REAL II, LLC requests that the Court enter judgment in its favor and against Defendants and grant the following relief:

**A. Declaratory Relief**

Declarations that:

1. Defendants violated GET's rights under the Due Process Clause of the Fourteenth Amendment;
2. Defendants violated GET's rights under the Equal Protection Clause of the Fourteenth Amendment;

3. Defendants violated 47 U.S.C. § 546 by initiating the renewal process, delaying it for almost two years, and granting the renewal without the procedures the statute requires;
4. Ordinance 2021-15 and the permit framework are preempted and void under the Supremacy Clause (because Clarity obtained a Title VI cable authorization, federal law governs the terms of its operations, and the City's use of state law to give Clarity lighter obligations violates the Supremacy Clause);
5. The City violated the parity requirement of 11 O.S. § 22-107.1(B) by subjecting GET to less favorable and more burdensome terms than Clarity;
6. Defendants' modification of the court-enforced franchise and creation of a competing permit framework circumvented a federal court order in violation of the Due Process Clause and the Supremacy Clause;
7. Defendants violated the Oklahoma Open Meeting Act, and Ordinance 2021-15 is invalid under 25 O.S. § 313;
8. Defendants violated the Oklahoma Open Records Act;
9. The City breached the court-enforced franchise agreement and Pole Attachment Agreement by modifying their terms without judicial authorization;
10. The City breached the covenant of good faith and fair dealing;

11. The City violated 11 O.S. § 22-107.1(B) by delaying enforcement of GET's statutory parity right and failing to actually enforce parity even after June 16, 2022;
12. Kennedy breached his fiduciary duty to the City;
13. Clarity committed conversion and trespass to chattels against GET's property;
14. Clarity engaged in deceptive trade practices in violation of 78 O.S. § 51;
15. Ordinance 2021-15 is ultra vires and void ab initio;
16. The Mayor and Council breached their oaths of office under Okla. Const. Art. XV, § 1; and
17. Defendants damaged GET's property in violation of Okla. Const. Art. II, § 23.

**B. Injunctive Relief**

1. Prohibiting Defendants from enforcing any provision of Ordinance 2021-15 or the permit framework that conflicts with 47 U.S.C. §§ 541(b)(3), 544(b), 546, or 556(c);
2. Requiring Defendants to equalize the regulatory obligations imposed on all cable operators providing service in Blackwell under Title VI;
3. Requiring Defendants either to complete the § 546 renewal process or to declare the November 18, 2021 renewal defective and conduct a new process that complies with federal law;

4. Requiring Defendants to preserve all records, electronically stored information, and communications relevant to this action;

5. Prohibiting the City from enforcing the "one attachment per pole" limitation;

6. Prohibiting Clarity from further physical interference with GET's infrastructure;

7. Requiring an accounting of all franchise fees and pole attachment fees paid by GET and Clarity; and

8. Disqualifying Kennedy from representing the City in this litigation.

**C. Compensatory Damages**

Against all Defendants, jointly and severally, in an amount to be proven at trial but not less than $3,000,000, including direct economic losses; loss of market position and competitive harm; impairment of capital investments; Plant B removal and accelerated fiber migration costs; long-term business harm; and the costs of compliance with the unequal regulatory framework.

**D. Punitive Damages**

Against Kennedy, Stoops, Wieland, Eubanks, the Mayor, and Council members individually, and against Clarity, in an amount sufficient to punish and deter their knowing, willful, and malicious conduct.

**E. Statutory Damages and Attorney's Fees**

Under the Oklahoma Open Records Act, 51 O.S. § 24A.17, and under 78 O.S. § 54(a) (Deceptive Trade Practices Act), Costs and reasonable attorney's fees under 42 U.S.C. § 1988 and other applicable law, Prejudgment and post-judgment interest as

permitted by law, spoliation sanctions, including an adverse inference instruction, if the Court finds that records were destroyed or withheld in bad faith.

**F. Other Relief**

All other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Under the Seventh Amendment and Federal Rule of Civil Procedure 38(b), GET demands a trial by jury on all issues so triable.

Dated: November 11th, 2026

Respectfully submitted,

s/ R. Todd Waddell________________________

R. Todd Waddell, OBA No. 17784
THE LAW OFFICE OF R. TODD WADDELL
9208 N. Kelley
Oklahoma City, Oklahoma 73131
Telephone: (405) 446-8681
Facsimile: (405) 276-8024
Email:
Todd@ToddWaddellLaw.onmicrosoft.com

**ATTORNEY FOR PLAINTIFF**
GET REAL II, LLC

**VERIFICATION**

I, Jessica Pepper, declare as follows:

1. I am the sole member and authorized representative of Plaintiff GET REAL II, LLC, and I am authorized to make this verification on its behalf.

2. I have read the foregoing Verified Complaint. The factual allegations in it are true and correct of my own personal knowledge, except as to matters stated upon information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 11th, 2026, at Blackwell, Oklahoma.

s/Jessica Jane Pepper
Jessica Pepper
Sole Member and Authorized Representative
GET REAL II, LLC